UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNDER SEAL,

            Plaintiff,

   v.

UNDER SEAL

            Defendant.

COMPLAINT FOR VIOLATIONS OF THE FALSE CLAIMS ACT
(31 U.S.C. §3729, *et seq.*)

JURY TRIAL DEMANDED

FILED UNDER SEAL PURSUANT TO 31 U.S.C. §3730(b)(2)

# DO NOT PLACE ON PACER

598148.1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES ex rel. SCOTT GRUEL, <br>    2354 Tradewinds Drive <br>    Gautier, MS 39553 <br><br>       Plaintiff, <br><br>   v. <br><br> HUNTINGTON INGALLS INDUSTRIES, INC., and DOEs One through Ten <br>    4101 Washington Avenue <br>    Newport News, VA 23607 <br><br>       Defendants. | |

COMPLAINT FOR VIOLATIONS OF THE FALSE CLAIMS ACT
(31 U.S.C. §3729, *et seq.*)

JURY TRIAL DEMANDED

FILED UNDER SEAL PURSUANT TO 31 U.S.C. §3730(b)(2)

2

Through his attorneys, Plaintiff and *qui tam* Relator Scott Gruel alleges for his Complaint against Defendant Huntington Ingalls Industries, Inc. and DOE Defendants as follows:

## I. INTRODUCTION

1. This is an action to recover damages and civil penalties, on behalf of the United States Government (the "United States") arising from false and/or fraudulent statements, records, claims made and caused to be made by the Defendants and/or their agents and employees in violation of the Federal False Claims Act, 31 U.S.C. §3729, *et seq.*, as amended ("FCA").

2. This *qui tam* case is brought against Huntington Ingalls Industries, Inc. ("HII") and DOE defendants for knowingly submitting or causing the submission of false claims for payment to the United States in connection with a contract with the United States Navy for the construction of the USS Fort Lauderdale, LPD 28, an amphibious transport ship. As alleged below, HII and the DOE defendants knowingly submitted or caused to be submitted claims for payment under the contract that failed to comply with material contractual requirements. Specifically, HII submitted claims for payment under the contract for the construction of LPD 28, which required that the pipe and fittings used in constructing the ship meet certain military specifications and standards. Those specifications and standards require pipe used for potable water and other purposes to be a 90/10 copper nickel alloy. So-called "90/10" material is comprised of 90 percent copper and 10 percent nickel, with trace amounts of other metals. Under the Unified Numbering System (UNS) for commercial materials, this 90/10 alloy is identified as C00706. The military specifications and standards require use of this type of pipe and compatible fittings because it resists corrosion, which is critical in a marine environment. In violation of military specifications and standards, HII used material in the construction of the LPD 28 that was not a true 90/10 alloy as

3

required and represented, but instead used material that included higher amounts of lead, iron, and other metals than permitted.

3. The risks of using the noncompliant pipe and fittings are potentially severe. For the pipes on the ship that carry potable water, the pipes and fittings can corrode and risk the health of the service members who drink water carried through the pipes. For the pipes carrying fuel, the corrosion of the pipe and fittings can lead to leaks, which greatly increases the risk of fire, which can have catastrophic consequences on a ship at sea. Both of these examples affect the ability of this ship to serve the national security needs of the United States for combat readiness, as a vessel with substandard pipe and fittings would have to be effectively ripped apart to remove and replace the defective material if it were to fail. The government specifies the use of certain alloys for pipe and fittings in order to avoid these risks. By knowingly seeking payment when it was not providing the quality of material it had promised to provide to the government, HII violated the FCA. As a result of the use of this substandard material, the ship's systems are now much more vulnerable to corrosion and failure than they should be, and the pipe and fittings will have to be replaced. Had the Navy been aware that the pipe and fittings used on the ships being constructed by HII was not of the quality represented, the Navy would not have allowed it to be installed and would not have paid for it.

4. Because the pipe and fittings used on the LPD 28 comes from the same supply that is used on additional ships that HII is building for the United States, upon information and belief, such noncompliant material is being used in the construction of other ships.

5. The FCA was originally enacted in 1863 during the Civil War to address the rampant fraud against the Government, including the supply of substandard products to the Union Army. The FCA was substantially amended in 1986 by the False Claims Amendments Act. Congress enacted the 1986 amendments to enhance and modernize the Government's tools for recovering losses sustained by frauds against it after finding that federal program fraud was pervasive. The amendments were intended

4

to create incentives for individuals with knowledge of Government frauds to disclose the information without fear of reprisals or Government inaction, and to encourage the private bar to commit resources to prosecuting fraud on the Government's behalf. Congress amended the Act again in 2009 and 2010 to address court interpretations of the Act that were inconsistent with Congress's intent in modernizing the statute.

6. The FCA imposes liability on anyone who, *inter alia*: (a) knowingly presents, or causes to be presented, false or fraudulent claims for payment or approval to the United States Government; (b) knowingly makes, uses, or causes to be made or used false records and statements to induce the Government to pay or approve false and fraudulent claims; (c) conspires to defraud the Government by getting a false or fraudulent claim allowed; or (d) knowingly makes, uses, or causes to be made or used, a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the Government.

7. Any person who violates the FCA is liable for a civil penalty for each violation, plus three times the amount of the damages sustained by the United States.

8. The FCA allows any person having information about false or fraudulent claims to bring an action for the person and the United States, and to share in any recovery. The FCA requires that the complaint be filed under seal for a minimum of 60 days (without service on the defendants during that time).

9. *Qui tam* plaintiff and Relator Scott Gruel brings the current action based on the FCA and seeks through this action to recover damages and civil penalties arising from the Defendants' violations of the FCA in submitting or causing the submission of false claims for payment to the United States.

## II. PARTIES

10. Plaintiff Relator Scott Gruel ("Relator") is a resident of Gautier, Mississippi. Until May of this year he was employed by HII as a pipefitter at the Pascagoula, Mississippi shipyard operated by HII. Through his work as a pipefitter for HII, Relator gained first-hand knowledge of the use of substandard pipe and fittings as

alleged in this Complaint.

11. The United States is the real party plaintiff in interest. The Naval Sea Command, located in Washington, D.C., is the relevant contracting authority.

12. Defendant Huntington Ingalls Industries, Inc., ("HII") is a publicly traded company, incorporated in Delaware, with its principal place of business in Newport News, Virginia. HII is the largest military shipbuilding company in the United States. HII maintains corporate offices for its shipbuilding division in Washington, D.C.

13. Defendants DOEs one through ten are subcontractors who provided the non-compliant pipe and fittings to HII. The identities of these subcontractors are not known at present but will be supplied at the earliest opportunity. This information is exclusively in the possession of the Defendants.

### III. JURISDICTION AND VENUE

14. This Court has jurisdiction over the subject matter of this action pursuant to both 28 U.S.C. §1331 and 31 U.S.C. §3732, the latter of which specifically confers jurisdiction on this Court for actions brought pursuant to 31 U.S.C. §§ 3729 and 3730.

15. Although the issue is no longer jurisdictional, there has been no statutorily relevant public disclosure of the "allegations or transactions" in this Complaint within the meaning of 31 U.S.C. §3730(e)(4). Moreover, Relator would qualify under that section as an "original source" of the information in this Complaint even had such a public disclosure occurred as he has direct and independent information that would materially add to any publicly disclosed allegations or transactions of fraud and he voluntarily provided his information to the Government before filing this Complaint.

16. This Court has personal jurisdiction over HII pursuant to 31 U.S.C. §3732(a) because that section authorizes nationwide service of process and because Defendant HII has minimum contacts with the United States and transacts substantial business in the District of Columbia.

17. Venue is proper in this District pursuant to 31 U.S.C. §3732(a) because Defendant HII transacts business in, and acts proscribed by 31 U.S.C. § 3729 were committed in, the District of Columbia.

## IV. APPLICABLE LAW

### A. The False Claims Act

18. The False Claims Act ("FCA"), 31 U.S.C. § 3729, *et seq.*, as amended, prohibits any person from knowingly making, or causing to be made, a false or fraudulent claim for payment to the United States. 31 U.S.C. § 3729(a)(1)(A). The FCA also prohibits knowingly making, using, or causing to be made or used a false record or statement material to a false or fraudulent claim. 31 U.S.C. § 3729(a)(1)(B).

19. A false or fraudulent claim under the FCA may take many forms, "the most common of which is a claim for payment for goods and services not provided or provided in violation of contract terms, specification, statute or regulation." False Clams Amendment Act of 1986, S. Rep. No. 99-345, at 9 (1986), *reprinted in* 1986 U.S.C.C.A.N. 5266, 5274. The terms "false or fraudulent" have the same meaning as under the common law and extend to misrepresentations by omission.

20. The misrepresentation must be material, which the FCA defines to mean "having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." 31 U.S.C. § 3729(b)(4).

21. The FCA defines knowingly to include actual knowledge, reckless disregard, and deliberate ignorance. 31 U.S.C. §3729(b)(1)(A). No specific intent to defraud need be shown. 31 U.S.C. § 3729(b)(1)(B).

### B. HII's Contracts with the United States Navy

22. HII contracted with the Navy to build LPD 28, the USS Fort Lauderdale, which is currently under construction and scheduled for delivery in 2020. Contract No. N00024-16-C-2431, as modified, awarded $1.46 billion for design and construction of the ship. The LPD 28 is one of the San Antonio class of ships, which is part of the Navy's amphibious assault force. The ship is 684-foot long, 105-foot wide ships, and is

used to deliver Marines, their equipment and supplies to combat destinations. The ships are also to be used for humanitarian assistance and disaster relief missions.

23. USS Fort Lauderdale is a transitional ship and therefore a critical ship for the Navy. The Navy is integrating design features and cost-reduction strategies around the Fort Lauderdale to be integrated into the upcoming class of vessels known as the LX(R) class of amphibious warfare ships.

24. HII is also in the process of constructing LPD 29, the Richard M. McCool. HII was awarded a $1.4 billion contract to design and build the LPD 29, which is expected to be completed in 2023. The Navy also recently awarded HII a $1.5 billion fixed price incentive modification to a previously awarded contract N00024-18-C-2406 for LPD 30.

25. Upon information and belief, these contracts incorporate relevant military standards and specifications, including the specifications for materials used on Navy ships. Military Standards ("MIL-STD") establish uniform engineering and technical requirements for procedures, practices and methods. *See* MIL-STD-962. Military specifications ("MIL-SPEC") describe essential technical requirements for military material or modified commercial items. *See* MIL-STD-961.

### B. Specifications for Pipe Installed on Navy Ships

26. Military specification MIL-T-16420K governs the composition of pipe for basic piping systems on Navy surface ships. In general, pipe should be 90/10 copper-nickel (copper alloy no. 706) or 70/30 copper-nickel (copper alloy no. 715). *See* MIL-T-16420K, § 1.2. The range of acceptable iron content for 706 is 1.0 to 1.8 percent and for 715 is .40 to 1.0 percent. MIL-T-16420K, § 3.2.

27. Military Standard 777F for piping components for naval surface ships provides that piping for potable water should be 90/10 copper-nickel alloy. *See* MIL-STD 777F, Table XVI (citing MIL-T-16420K). The fittings used with 90/10 pipe must be of compatible material. *See* MIL-STD 777F, Table XVI.

28. The pipe should be marked in accordance with FED-STD-185 with the

manufacturer's name, trademark or symbol and the allowed designation. *See* MIL-T-16420K, § 3.10.

29. The contractor is responsible for inspection and must provide and maintain an inspection system acceptable to the government and in accordance with MIL-I-45208. *See* MIL-T-16420K, § 4.1.

30. Copper alloy 706 (90/10) must meet a magnetic permeability test. MIL-T-16420K, § 3.6 (magnetic permeability (alloy 706 only)). Magnetic permeability is the ability of a magnetic material to support the formation of a magnetic field within itself. It measures the degree of magnetization that a material obtains in response to an applied magnetic field. Various forms of metal behave differently when exposed to a magnet. Some materials, like steel, are fully magnetic, while materials such as copper, are not. The more conductive a material is to magnetic fields, *i.e.*, the more "magnetic" a substance is, the higher its permeability. The unit of measurement for magnetic permeability is Henries per meter, notated by H/m, the Greek letter $\mu$, or mu. When specified in section 6.1 of MIL-T-16420K, magnetic permeability of pipe tested in accordance with section 4.4.5 of the specification shall not exceed 1.05 mu. MIL-T-16420K, § 3.6. Failure of test specimens to comply with this requirement shall be cause for rejection of the lot from which the specimen was selected. MIL-T-16420K, §4.4.5.

31. The composition of the pipe is crucial because copper-nickel alloys resist corrosion. *See, e.g.,* Elrajei, Elshadesh, Ezuber, *Corrosion Failure in 90/10 CuproNickel Tubes in a Desalinization Plant*, Desalinization and Water Treatment 17 (Sept. 2010). Although some iron can be beneficial in the copper nickel alloys, above 2% can accelerate corrosion. *See id.* at 21-22. The buildup of corrosion can lead to further corrosion as it acts as an obstacle to water flow and accelerates turbulence. *Id.*

32. For pipes that carry potable water, corrosion is dangerous to the health of the personnel who drink the water. *See* NSF/ANSI-61-2016 International Standard/American National Standard for Drinking Water Additives, Drinking Water

9

System Components – Health Effects; *see also* NAVMED P-5010-6 (Rev. 7-2005), Manual of Preventive Medicine, Chapter 6, Water Supply Afloat (25 July 1995). For the pipes that carry fuel, the corrosion can lead to leaks in the pipes and fittings, which greatly increase the risk of fire.

## V. DEFENDANTS' FRAUDULENT PRACTICES

33. HII knowingly violated material contractual requirements by contracting to provide a ship constructed of material that met certain specifications and standards and failed to do so while claiming payment as if those requirements had been met.

34. In or about March/April 2018, Relator was walking in the production area of the LPD 28 with his General Foreman, Samuel Jay Johnson, and his Foreman, Shae Wilkerson. HII constructs the LPD by building sections or individual units of the ship, and then joining the modules together. A pipefitter from their crew, Roger Moore, who was working on unit 1582 or 1583, called out to the Relator, Johnson and Wilkerson. Moore had been installing a 90/10 pipe system on a wing wall of the unit and showed them that when he put a six-inch magnetic level to an elbow fitting, the level stuck to the fitting.

35. A magnet should not adhere to 90/10 pipe because the alloy has a low level of magnetic permeability. Use of a magnet to inspect pipe is a common technique to determine if the composition of pipe is what it purports to be. Some alloys may, or may not, be attracted to a magnet depending on the exact composition and processing of the alloy. A magnetic inspection can show that a part is not a particular material, or indicate an issue with the composition of the part, but it cannot demonstrate what the composition of that part is.

36. Upon seeing Moore's demonstration of the magnetic quality of the pipe, the Relator untapped the cap at the end of the elbow to see if there were some carbon debris in the elbow, because such debris could affect the magnetic quality of the pipe, but the section was clear of any debris. Both Moore, a pipe fitter with 20 years of experience, and the Relator were surprised that the magnet stuck to the pipe and that

10

598148.1

there was not an obvious explanation.

37. In response to Moore's demonstration, General Foreman Johnson said, "I don't want to know anything about that" and walked away. Foreman Wilkerson observed, "that's Jay Johnson for you." Neither Moore nor the Relator took any further action at that time, but both were aware that the fact that pipe that should be a 90/10 alloy was magnetic indicated a potentially very significant problem and that their supervisors were aware of this.

38. In or about May of 2018, the Relator was moved from the production area where units were constructed to the boat itself and was assigned to the potable water pumps in the main machinery room. This system supplies potable water to the ship. The Relator tested that pipe in that room with a magnet and the magnet stuck to multiple samples of pipe, which was highly unusual.

39. Following his test of the pipe in the main machinery room, the Relator met with Carlos Molds, the H.R. manager and said the he had information about work under the Navy contract and that he would like to speak with the government compliance officer, Andy Byrd. While the Relator was present, Molds dialed Byrd's number and left a message. Molds indicated that he would contact Relator when he heard back from Byrd, but the Relator never heard from Molds about this.

40. In the late summer, early fall of 2018 the Relator was placed in the JP5 pump room of the LPD 28 to hook up pumps and tanks. He determined that about 40 percent of the pipe and fittings in that room were magnetic. In addition, the welds, which are intended to weld copper nickel material, will not function properly when applied to material that is not the correct copper-nickel alloy and could eventually fail.

41. Even if some of the pipe and fittings meet the standard for the required copper-nickel alloy, the good pipe and fittings can be damaged by corrosion of the substandard material. Contaminants caused by this piping can also cause particulate matter to crystallize in the system, reducing efficiency and causing filters, screens, and traps to clog more quickly than they would if the pipe and fittings were compliant. This

11
598148.1

can impose burdens on maintenance crews at sea and can create shorter maintenance intervals if pumps fail because of this foreign object debris ("FOD"). Welding dissimilar metal alloys together can also cause "galvanic corrosion," where one metal corrodes or dissolves when it comes into electrical contact with a different metal in a corrosive environment, like sea water. This type of corrosion has plagued other vessels in the Navy.

42. Further complicating the problems caused by use of noncompliant pipe and fittings is that there is no way to tell which material meets specification and which does not, short of a section-by-section metallurgical sampling of the pipe and fittings, which is practically impossible after construction of the vessel is completed. Under these circumstances, a system contamination problem could not be rectified without removal and replacement of the pipe. This could create readiness problems for the Navy and strain the other vessels in the fleet, which would have to carry the load.

43. The Relator believed that the presence of a substantial amount of noncompliant pipe and fittings in the fuel room and in other areas of the ship made the pipe and fittings used throughout the ship suspect. The Relator carried a magnet in his pocket to test some of the pipe and fittings. Walking through different areas of the ship, he tested the magnet on various sections of pipe that are intended to carry potable water. The magnet stuck to a number of sections of pipe, indicating that the pipe had more than trace amounts of material that was not copper or nickel. The Relator has identified such noncompliant pipe and fittings throughout the LPD 28, including but not limited to the main machinery room, the upper engine room osmosis machines, the local fire-fighting system in all areas of the ship, the fourth deck ship store room, the engine room, and the pump room. Although the substandard material may not comprise 100 percent of the pipe and fittings used on the ship, informal testing shows that the percentage is substantial. In addition, the corrosion of bad pipe and fittings can damage conforming material and render it substandard.

44. HII is aware of the military standards and specifications and of the

importance of using the correct pipe. Several quality alerts distributed to HII personnel have noted the importance of correctly identifying 90/10 and 70/30 pipe and that any material changes or deviations from specified material types or grades is not allowed without formal documentation from the HII engineering department.

45. The Relator does not believe the Navy is aware that the pipe and fittings being used on the LPD 28 is substandard because to his knowledge his superiors have not reported it and no action has been taken. Although Navy personnel have been aboard the ship, the composition of the pipe and fitting material is not obvious from a visual inspection.

46. Upon information and belief, Relator alleges that HII has submitted claims for payment, and has been paid, for its work installing and fitting the pipe on the LPD 28.

## VI. DEFENDANTS' VIOLATIONS OF THE FALSE CLAIMS ACT

47. By knowingly seeking payment for the materials used to construct the LPD 28 and possibly other ships, in violation of material contractual requirements, Defendants presented, or caused to be presented, false or fraudulent claims for payment to the United States. The contractual requirements for the pipe used on the LPD 28 and other Navy ships are material to the government's payment decisions because of the critical importance of safe drinking water and the safety of the fuel rooms have to the functioning of a Navy vessel at sea, as reflected in the Navy standards and specifications.

48. Upon information and belief, the Relator alleges that the United States did not have actual knowledge of the use of the substandard pipe on the LPD 28.

49. Upon information and belief, the Relator alleges that the United States has not knowingly permitted the use of substandard pipe and enforces its contractual specifications and standards for the construction of Navy ships.

50. Every document submitted, or statement made to the United States in connection with obtaining payment for the LPD 28 constructed with nonconforming

13

598148.1

pipe and fittings is a false or fraudulent claim for payment or approval.

51. By knowingly seeking payment under contracts to construct the LPD 28 while misrepresenting compliance with the material requirements for pipe and fittings used to construct the ships, Defendants made, used or caused to be made or used, false records and statements material to these false claims for payment.

52. Every document submitted, or statement made to the United States in connection with payment under contracts with the United States Navy to construct the LPD 28 and other ships in compliance with the pipe and fitting specifications is a false statement or record material to a false claim for payment or approval.

53. Relator cannot at this time identify specific invoices or other claims for payment submitted to the Government for the LPD 28 contract because he did not have access to billing information in the performance of his job. Given that the contract for the LPD 28 involves the United States Navy and that HII is being paid for the work, there is reliable indicia that HII has submitted requests for payment for the LPD 28 to the United States.

54. Upon information and belief, the same substandard pipe and fittings used on the LPD 28 is being used on additional ships HII is constructing for the Navy. The basis for this belief is that the pipe for constructing ships is delivered to a single storage area at the shipyard, and all shipbuilding crews draw from the same supply.

## COUNT I
### Federal False Claims Act
### 31 U.S.C. § 3729(a)(1)(A)

55. Relator realleges and incorporates by reference the allegations in paragraphs 1-54.

56. This is a claim for treble damages and penalties under the False Claims Act, 31 U.S.C. § 3729, *et seq.*, as amended.

57. Through the acts described above, Defendants have knowingly presented or caused to be presented to the United States false or fraudulent claims for payment or

approval for work done on contracts paid for by the United States in violation of 31 U.S.C. § 3729(a)(1)(A).

58. The United States, unaware of the falsity or fraudulence of claims made or presented or caused to be presented by Defendants, their agents, and employees approved, paid and continues to approve and pay claims that otherwise would not have been approved or paid.

59. Defendants knew, both in fact and within the meaning of the Federal False Claims Act, that through the acts described above it would be violating the Federal False Claims Act, by getting false or fraudulent claims submitted or caused to be submitted by Defendants allowed or paid by the United States.

60. Relator cannot now identify each of the false claims for payment that Defendants presented or caused to be presented because Relator has no access to records in Defendants' possession.

61. By reason of the Defendants' acts, the United States has been damaged, and continues to be damaged, in a substantial amount yet to be determined.

62. The United States is also entitled to the maximum penalty under 31 U.S.C. § 3729(a)(1) as adjusted for inflation under 28 C.F.R. § 85, for each and every violation alleged herein for each and every violation alleged herein.

### COUNT II
### Federal False Claims Act
### 31 U.S.C. § 3729(a)(1)(B)

63. Relator realleges and incorporates by reference the allegations in paragraphs 1-54.

64. Through the acts described above, Defendants knowingly made, used, or caused to be made or used false records or statements material to false or fraudulent claims paid or approved by United States for work done on contracts paid for by the United States in violation of 31 U.S.C. § 3729(a)(1)(B).

65. The United States, unaware of the falsity of the records or statements

made or used, or caused to be made or used by Defendants, their agents, and employees approved, paid and continues to approve and pay claims that otherwise would not have been approved or paid.

66. Defendants knew, both in fact and within the meaning of the Federal False Claims Act, that through the acts described above they would be violating the Federal False Claims Act, by making or using false statement or records material to false or fraudulent claims submitted by Defendants.

67. By reason of the Defendants' acts, the United States has been damaged, and continues to be damaged, in a substantial amount yet to be determined.

68. The United States is also entitled to the maximum penalty under 31 U.S.C. § 3729(a)(1), as adjusted for inflation under 28 C.F.R. § 85, for each and every violation alleged herein.

## PRAYER

WHEREFORE, Relator prays for judgment against Defendants as follows:

1. that Defendants cease and desist from violating 31 U.S.C. § 3729, *et seq.*;

2. that this Court enter judgment against Defendants in an amount equal to three times the amount of damages the United States has sustained because of Defendants' actions, plus a civil penalty for each violation of 31 U.S.C. § 3729, as provided in 31 U.S.C. § 3729 and adjusted for inflation, 28 C.F.R. § 85;

3. that Plaintiff-Relator be awarded the maximum amounts allowed pursuant to § 3730(d) of the Federal False Claims Act;

4. that Plaintiff-Relator be awarded all costs of this action, including attorneys' fees and expenses; and

5. that the United States and Plaintiff-Relator recover such other relief as the Court deems just and proper.

598148.1

## REQUEST FOR TRIAL BY JURY

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff-Relator hereby demands a trial by jury.

Dated: July 31, 2019

*(signature)*

Peter W. Chatfield
PHILLIPS & COHEN LLP
2000 Massachusetts Avenue
Washington, DC  20036
Tel: (202) 833-4578
Fax: (202) 833-1815
pchatfield@phillipsandcohen.com
D.C. Bar No. 418576

Claire M. Sylvia*
PHILLIPS & COHEN LLP
100 The Embarcadero, Suite 300
San Francisco, CA 94105
Tel:  (415) 836-9000
Fax:  (415) 836-9001
csylvia@phillipsandcohen.com
*pro hac vice* (pending)

J. Marc Vezina*
Vezina Law
18 S. Broadway Street, Suite 200
Lake Orion, MI  48362
jmv@vezinalaw.com
*pro hac vice* (pending)

Counsel for *Qui Tam* Plaintiff-Relator